Michael R. McCarter
CascadeCarry@outlook.com
53161 Bridge Dr.
La Pine Oregon, 97739
503-339-5654
Plaintiff, appearing *Pro Se*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MICHAEL R. MCCARTER, in his official capacity as president of *Move Oregon's Border*<br><br>Plaintiff,<br><br>v.<br><br>KATE BROWN, in her official capacity as Governor of Oregon, BEV CLARNO, in her official capacity as Secretary of State of Oregon, STEFANIE KIRBY in her official capacity as Baker County Clerk, CHERYL SEELY in her official capacity as Crook County Clerk, RENEE' KOLEN in her official capacity as Curry County Clerk, DANIEL LOOMIS in his official capacity as Douglas County Clerk, BRENDA PERCY in her official capacity as Grant County Clerk, DERRIN ROBINSON in his official capacity as Harney County Clerk, CHRIS WALKER in her official capacity as Jackson County Clerk, KATHERINE ZEMKE in her official capacity as Jefferson County Clerk, RHIANNON HENKELS in her official capacity as Josephine County Clerk, ROCHELLE LONG in her official capacity as Klamath County Clerk, STACIE GEANEY | Case No.: 6:20-cv-01048-MC<br><br>MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT |

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 1

in her official capacity as Lake County Clerk, GAYLE TROTTER in her official capacity as Malheur County Clerk, BOBBI CHILDERS in her official capacity as Morrow County Clerk, JENINE MCDERMID in her official capacity as Sherman County Clerk, KIM LINDELL in her official capacity as Chief Elections Officer of Umatilla County, ROBIN A. CHURCH in her official capacity as Union County Clerk, and SANDY LATHROP in her official capacity as Wallowa County Clerk,

                Defendants.

---

1. Pursuant to Federal Rules of Civil Procedure 65(a) and (b), and in view of the public health crisis precipitated by the coronavirus pandemic known as COVID-19 and the ensuing emergency measures adopted by the State of Oregon, Plaintiff respectfully moves the Court to enter a preliminary injunction and/or temporary restraining order that prohibits Defendants from enforcing or applying provisions of Oregon or local law that require voters' signatures on petitions as a condition of qualifying a county initiative for the election ballot. Plaintiffs specifically request that the Court enjoin Defendants from enforcing, in 2020, the following statutory provisions as applied to county ballot initiative petitions approved for circulation by a county elections official: ORS 250.205(4), and Jackson County Charter Chapter VII Section 28(2)(a), and any local charter or ordinance that may require Umatilla County to require voter signatures for qualification of ballot initiatives.  Jackson County and Umatilla County are the only home-rule counties relevant to this case.

2. Jackson County Charter Chapter VII Section 28(2) reads as follows:

> An initiative measure and a referendum may be proposed by the signatures of qualified County voters of a number equal to the following percentages of the total number of votes cast in the County for all candidates for Governor at the regular

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 2

gubernatorial election next preceding the filing of the petition:
(a) Initiative petitions, six percent;
(b) ...

3. Plaintiff requests that the Court direct Defendants to verify, qualify, and certify as a county measure for the November 3, 2020 ballot any petitions that have been filed by an agent of *Move Oregon's Border* and that have been approved for circulation prior to or on August 5, 2020 by the chief elections official of their county, without requiring the signatures from voters otherwise required by law.

4. The identification number given to each active *Move Oregon's Border* petition by a county elections official is given below:

Douglas County: P-10-2020-02

Umatilla County: 30-2020-IP2

Josephine County: 2020-01

Grant County: #12-77

Curry County: 20-01

Harney County: 20-05

Sherman County: PP 2020-04

Wallowa County: 32-003

Baker County: 1-104

Union County: 31-IP-2020-1

Morrow County: I-2020-5

Jackson County: Jack 20-07

Klamath County: K-20-5

Jefferson County: 20-05-IN

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 3

Malheur County: 2020-23-03 (approved for circulation on July 1, 2020)

Lake County: 2020-23-3 (similarity to the Malheur County number is coincidental)

Crook County: revised prospective petition filed by chief petitioner Shawn Cross with the County Clerk on June 26, 2020. No identification number has yet been provided.

5. Plaintiff certifies that he emailed his Complaint, this Motion, and Plaintiff's Proposed Order on July 6, 2020 to each Defendant or counsel of Defendant, using email addresses listed on government websites or in government emails.

## MEMORANDUM OF LAW IN SUPPORT

The COVID-19 pandemic has given rise to an extraordinary set of circumstances in Oregon and nationwide. In an effort to contain the virus and protect the public health, the State of Oregon has implemented several emergency measures that, although perhaps reasonable in light of the public health crisis, make it impossible for Plaintiff and other citizens to comply with the statutory procedures they must follow to participate in Oregon's electoral processes. In particular, as petition circulator, Plaintiff is required by law to obtain voters' signatures on petitions to qualify his ballot initiatives on Oregon's November 3, 2020 general election ballot. Under the emergency measures now in place, however, Plaintiff cannot lawfully comply with these requirements. These emergency measures are listed in Plaintiff's Complaint, paragraphs 35-38 and 40-41.

The public-health emergency caused by COVID-19 and the various orders issued by the Governor under color of law make it apparently unlawful and practically impossible to gather petition signatures in these counties. Even during Phase II, the Governor requires this distance of six feet to be maintained. It is impossible to politely throw someone a pen and a clip board from a distance of six feet. Presumably, even hands of different individuals must be kept six feet apart, since hands themselves are considered to be a part of an individual's person.

The deadline for submitting county ballot initiative signatures for this election cycle is August 5, 2020. Plaintiff has received from Defendants no offers of relief or accommodation. Plaintiff therefore urgently needs the relief requested herein, to protect his speech and petitioning rights as guaranteed by the First and Fourteenth Amendments. In the absence of such relief, Plaintiff will suffer irreparable harm, because his petitions and his organization's petitions will be excluded from the 2020 election ballot.

**Argument**

We here incorporate the text of the argument given in pages 11 through 20 in the Plaintiff's Motion for Temporary Restraining Order And/Or Preliminary Injunction in an ongoing case in the US District Court for the Southern District of Ohio, number 2:20-cv-02129. We request that the argument be understood to refer to Oregon rather than Ohio. As *Pro Se* Plaintiff, I humbly request that that argument be read in full at the link given in this footnote,[1] or in the facsimiles of that motion, which I have included as pages 7 through 16 of this Motion.

We exclude the first full paragraph of page 16 of that argument. In its place we note that *Move Oregon's Border* has generated great enthusiasm since the movement began in April 2019 and the 501(c)4 and Facebook page was officially founded in early 2020. Less than 12,800 people that follow the official Facebook page of the largest political party in the State of Oregon.[2] This page serves the whole state, which has a population of more than four million. Compare it to *Move Oregon's Border,* which serves a territory of eastern and southern Oregon which has a population of approximately 856,000. Its Facebook group has more than 9200 members.[3] And its rally before

---

[1] https://clearinghouse.net/chDocs/public/VR-OH-0085-0002.pdf
[2] https://www.facebook.com/ordems
[3] https://www.facebook.com/groups/GreaterIdaho/

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 5

the COVID-19 executive orders, its only rally, attracted an attendance estimated at five hundred people.[4]

We expect that Defendants will not claim that reducing the signature count threshold would lead to an ungainly number of ballot initiatives on the ballot, because the number of days remaining before the August 5 deadline is relatively small. It is so small that it will not present an opportunity to new entrants. In our experience (described in Complaint paragraph 31), it takes one to six months to get permission to circulate. Even after a prospective petition has been drafted that will meet the standards of a specific county clerk, the typical county government will take four weeks to issue an approval to circulate the petition. The reason it takes four weeks is explained in Complaint paragraph 52.

County ballot initiative signature campaigns must be completed within two years of a county clerk's approval to circulate a petition, except in Jackson County, where the time limit is one year. Very few county ballot initiatives have been approved to circulate in Oregon within the last two years, so the ballot will not be flooded with old ballot measures if the Court chooses to reduce the signature threshold for all county ballot initiatives in the relevant counties.

Dated: July 6, 2020.

s/Michael McCarter
Michael McCarter

---

[4] https://www.nrtoday.com/news/local/greater-idaho-proposal-greeted-with-enthusiasm-at-saturday-rally/article_45165ee3-6c41-54f0-9fcd-7825e522f0ef.html

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 6

## Argument

"When a district court is asked to issue a preliminary injunction, it … balances four factors …: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Vittitow v. City of Upper Arlington*, 43 F.3d 1100, 1108-09 (6th Cir. 1995).[17] Balancing these four factors, Plaintiffs are entitled to emergency relief.

I.      **Plaintiffs are Likely to Prevail on the Merits.**

    A.      **Making it Impossible to Collect Signatures In Order to Qualify Ballot Initiatives Violates the First and Fourteenth Amendments.**

States are not required to recognize popular democracy. Once they do, however, it is clear that the processes they employ to place initiatives and referenda on ballots are fully governed by the First and Fourteenth Amendments. *See Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution"). Popular democracy is no different from representative democracy in this regard. After all, States need not directly elect the vast majority of their representative officials -- including governors, Department heads, and even presidential electors -

---

[17] Although procedures differ, the substantive standard for issuing a temporary restraining order is essentially the same. *See Bryant v. Matvieshen*, 904 F. Supp.2d 1034, 1042 (E.D. Cal. 2012).

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 7

- but once they choose to do so those election procedures are governed by the First and Fourteenth Amendments. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780 (1983).

Ballot initiatives implicate "core political speech." *Meyer v. Grant*, 486 U.S. 414, 22 (1988). "First Amendment protections" are accordingly "at [their] zenith" and "exacting scrutiny" is required. *Id.* at 425, 420. For citizens in nearly half the states in the Union, ballot initiatives are "basic instruments of democratic government." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003).

In *Meyer*, 486 U.S. 414, for example, the Supreme Court invalidated a Colorado law that banned paying circulators who were collecting signatures to support initiatives. In *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), it invalidated Colorado laws requiring that initiative-petition circulators be registered voters, requiring that they wear identification badges, and that the proponents of the initiatives report the names and addresses of all their paid circulators. These cases leave no doubt that the processes used to certify initiatives and referenda are subject to full First and Fourteenth Amendment scrutiny. Further, they indicate that First and Fourteenth Amendment ballot access precedents for candidates are equally applicable in the context of placing initiatives on ballots. The Sixth Circuit, for its part, has recognized the holding in these cases and has thus applied First and Fourteenth Amendment restrictions to the processes that States like Ohio use to regulate initiatives. *See, e.g., Austin*, 994 F.2d at 296-97; *Schmitt*, 933 F.3d 628.

The extraordinary circumstances from which this case arises make it a relatively easy one to decide in terms of the need for relief. Under Ohio law as it now exists, Plaintiffs have <u>no lawful procedure by which they may qualify their initiatives for Ohio's November 3, 2020 general</u>

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 8

election ballot. Thus, Plaintiffs are entitled to some form of relief. Plaintiffs believe that this relief should include, given their past success in placing their decriminalization initiatives on local ballots, an order directing Defendant-LaRose to place their pending initiatives and those that they propose to file on local ballots without the need for additional supporting signatures.

This relief is justified because Ohio law, as modified by Defendants' orders and the current crisis, cannot withstand constitutional scrutiny under the analytic framework the Supreme Court set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Using that analysis, the Sixth Circuit ruled in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006), that Ohio's signature collection mechanism for political parties placed a severe burden on their First Amendment rights that could not be justified by any compelling concern. The same result is necessarily true here where Ohio's signature collection requirement under current circumstances makes it impossible to qualify initiatives for the ballot.

When states fail to provide candidates and parties with a workable procedure by which they may qualify for the ballot, the Supreme Court and lower federal courts have not hesitated to remedy the defect by placing candidates and parties on the ballot by court order. The same must be true for popular measures, as indicated by the Supreme Court in cases like *Meyer* and *Buckley*.

In 1976, for instance, several States provided no procedure for independent candidates to qualify for the ballot. In each of those States, independent presidential candidate Eugene McCarthy sought relief in federal court, and without exception the courts, including the Supreme Court, ordered that he be placed on the ballot. *See McCarthy v. Briscoe*, 429 U.S. 1317 (1976) (Powell, J. in Chambers) (placing McCarthy on Texas ballot); *McCarthy v. Askew*, 540 F.2d 1254, 1255 (5th Cir. 1976) (*per curiam*) (affirming order placing McCarthy on Florida's ballot);

*McCarthy v. Noel*, 420 F. Supp. 799 (D. R.I. 1976) (placing McCarthy on Rhode Island ballot); *McCarthy v. Tribbitt*, 421 F. Supp. 1193 (D. Del. 1976) (placing McCarthy on Delaware ballot); *McCarthy v. Austin*, 423 F. Supp. 990 (W.D. Mich. 1976) (placing McCarthy on Michigan ballot). As Justice Powell observed in *McCarthy v. Briscoe*, 429 U.S. 1317, the Supreme Court had followed the same procedure in 1968 when it ordered that several candidates who successfully challenged the constitutionality of Ohio's ballot access laws be placed on its ballot. *See McCarthy v. Briscoe*, 429 U.S. 1317 (citing *Williams v. Rhodes*, 89 S. Ct. 1 (Stewart, J., in Chambers, 1968)).

To use examples from the Sixth Circuit, consider Michigan's 1980 election. Michigan had failed to remedy the defect identified by the Court in Austin, meaning it had no constitutionally acceptable procedure for placing independent presidential candidates on its ballot. *See Hall v. Austin*, 495 F. Supp. 782 (E.D. Mich. 1980). The Court accordingly ordered that the independent candidates be placed on Michigan's ballot without any need for signature collection. *See id.* at 791-92. The issue arose again in 1984, because the Michigan Legislature still had not enacted a procedure for independent candidates to qualify for the ballot. An independent candidate for the State Board of Education filed suit, the district court again declared Michigan's ballot access scheme unconstitutional, and the Secretary was ordered to place the candidate on the ballot. *See Goldman-Frankie v. Austin*, 727 F.2d 603, 607-08 (6th Cir. 1984).

This Court took that same approach in *Libertarian Party of Ohio v. Brunner*, 462 F. Supp. 2d 1006 (S.D. Ohio 2008), after finding Ohio's ballot requirement for political parties ruled unconstitutional in *Blackwell*, 462 F.3d 579, had not been corrected. Rather than fashion a new requirement with new dates and numbers of signatures, this Court ordered the Libertarian

Party onto the ballot: "where a state has unconstitutionally prevented a party or a candidate from accessing the ballot, "a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support." *Id.* at 1015 (quoting *McCarthy v. Briscoe*, 429 U.S. at 1323). "[T]he Court finds that the Libertarian Party has the requisite community support to be placed on the ballot in the state of Ohio." *Id.*

In a separate case, *Moore v. Brunner*, 2008 WL 3887639, *5 (S.D. Ohio 2008), this Court also ordered the Socialist Party onto Ohio's ballot: "*Goldman–Frankie* established that a showing of support need not be "compelling" but rather, "sufficient." The Court finds that the Socialist Party USA has the requisite community support to be placed on the ballot in the state of Ohio ...." *See also Libertarian Party of Ohio v. Husted*, 2014 WL 11515569, *5 (S.D. Ohio 2014) ("*Brunner* remains good law ...and the evidence tends to show the LPO, OPG, and CPO have the requisite modicum of community support to warrant placement on the ballot as a matter of right under the First and Fourteenth Amendments").

Applying these principles here, although Ohio law prescribes procedures by which its citizens may place popular measures on local ballots, Ohio has in turn made it impossible for citizens to do so. This is no different than a State's granting to its citizens the right to run as a candidate for President but then making it impossible for them to do so. It is no different than creating a popular election mechanism for Presidential electors but then making it impossible for voters to cast their ballots. In all these situations, the First and Fourteenth Amendments are violated. In all these situations, a federal court is warranted in authorizing immediate relief. This

relief can take the form found in *McCarthy*, *Goldman-Frankie*, and *Brunner*, that is, directly placing the candidates or initiatives on the ballot, or it may take shape in a modified form.

Plaintiffs here have succeeded in the past in placing their marijuana decriminalization initiatives on local ballots. *See, e.g.*, *Schmitt*, 933 F.3d 628 (describing Thompson's and Schmitt's circulation efforts for initiatives presented in Windham and Garrettsville, Ohio). They have therefore established a sufficient modicum of past support to justify an order directing that their pending initiatives be placed on local ballots without signatures for the November 3, 2020 election.

Should an alternative remedy be preferred, guidance can be found in Courts' and States' reactions to the current COVID-19 pandemic crisis. Several states, for instance, have either voluntarily or by judicial order drastically reduced the number of signatures required for a candidate to be placed on the ballot. *See, e.g.*, *Esshaki v. Whitmer*, 2020 WL 1910154, at *12 (E.D. Mich., Apr. 20, 2020) (reducing the statutory signature requirement in Michigan by 50 percent); *Goldstein v. Sec'y of Commonwealth*, 2020 WL 1903931, at *9 (Mass., Apr. 17, 2020) (reducing the signature requirement in Massachusetts by 50 percent); N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30 percent of previous number); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending Vermont's statutory signature requirement entirely).

Along with reductions in the number of signatures, States have also switched to electronic signature collection mechanisms and extended deadlines. In Illinois, for example, it was ordered last week in *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687 (N.D. Ill., Apr. 23, 2020), that Illinois do all three: reduce its signature requirements for all candidates to 10 percent

of previous levels; extend the filing deadline from June 22, 2020 until August 7, 2020; and forego in-person, witnessed, wet and notarized signature collection processes in favor of the electronic dissemination and collection of supporting signatures. The Court also directly placed on Illinois's ballots the candidates of the Libertarian and Green Parties in contests where the two parties had previously established a modicum of support.

Chief Judge Pallmeyer in *Pritzker*, 2020 WL 1951687, at *4, explained:

> Reducing the required number of signatures to 10 percent accommodates the fact that Plaintiffs have not been able to rely on their usual signature-gathering methods for the 2020 general election ballot because the window for collecting signatures in Illinois was slated to begin on March 24, 2020, after the stay-at-home order took effect.
>
> Additionally, permitting candidates to submit physical or electronic copies of petitions accommodates the various practical barriers to collecting signatures at this time—due to the closure of most public places, Illinoisans may have limited access to the Internet or a printer, or may even be wary of opening mailed petitions.

(Citation omitted). She also described the electronic signature collection mechanisms developed in several states:

> Other states have similarly permitted signature collection and petition submission in both electronic and physical formats. *See, e.g.,* Fla. Emergency R. 1SER20-2 (Apr. 2, 2020); N.J. Exec. Order Nos. 105, 120 (Mar. 19, 2020, Apr. 8, 2020); Utah Exec. Order No. 2020-8 (Mar. 26, 2020). The court recognizes that the state will be burdened by extending the signature-gathering deadline, but finds this hardship outweighed by the significant difficulties that would be experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time. In particular, the court notes that even after some restrictions are lifted, until a vaccine is available, voters are likely to continue practicing social distancing and avoiding any physical hand contact with other persons or objects.

*Id.*

Chief Judge Pallmeyer's rationale applies equally here. Plaintiffs request that at bare minimum, should the Court choose not to directly order their initiatives on local ballots, Ohio's required number of signatures be reduced to 10% of the prior level. Ohio's in-person, witnessed,

17

and wet signature requirements, meanwhile, should be enjoined. Ohio, like Illinois, should be ordered to accept electronically collected signatures without wet signatures and that have not been personally witnessed by circulators. Ohio's deadline, like that in Illinois, should be extended for approximately six weeks in order to allow initiative sponsors the time needed to adjust their tried and true signature collection practices to the pandemic's conditions. The key, of course, is to insure that people remain safe while allowing Ohio's democratic processes to continue.

**B.      Imposing New Restrictions in the Middle of an Election Contradicts Basic Principles of Fair Notice in Violation of Due Process.**

The First Amendment expresses a strong aversion to retroactive legislation:

> A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. ... Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that <u>regulated parties should know what is required of them so they may act accordingly</u>; ...<u>When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.</u>

*Federal Communications Commission v. Fox Television Stations,* 567 U.S. 239, 253-54 (2012) (emphasis added).

Applying this principle, this Court in *Libertarian Party of Ohio v. Husted*, 2014 WL 11515569 (S.D. Ohio 201), ruled that Ohio's changes to its election laws in the midst of the 2013-14 election cycle violated the Due Process Clause. There, Ohio had in November 2013 passed a law that altered the process for minor parties to access the general election ballot in 2014. The Court concluded that this belated change in procedure interfered with "Plaintiffs' legitimate expectation that, having complied with the process that was (and remains) in place, they would have the opportunity to reap the political benefits of participating in the primary." *Id.* at *7. "The Ohio Legislature moved the proverbial goalpost in the midst of the game. Stripping

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 14

Plaintiffs of the opportunity to participate in the 2014 primary in these circumstances would be patently unfair." *Id.*

Likewise here. The pandemic and Ohio's emergency shutdown have "moved the proverbial goalpost in the midst of the game." It is patently unfair to now expect Plaintiffs to somehow attempt to comply with both Ohio's in-person signature requirement by mid-July and abide by Ohio's new distancing and shelter rules. Indeed, it is impossible.

## II. Plaintiffs Are Experiencing Irreparable Harm.

Plaintiffs are threatened with continuing irreparable injury. Any impediment placed on First Amendment rights, even for brief periods, causes irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Although Ohio is not required under the federal Constitution to utilize initiatives and referenda, once it does the First Amendment applies to those processes. *See Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution").

## III. Defendants Will Suffer No Injury.

Defendants will suffer no identifiable injury should the Court either order Plaintiffs' initiatives onto local ballots or modify Ohio's in-person signature collection requirements for the November 3, 2020 election. And even if they did, as pointed out by the Court in *Pritzker*, 2020 WL 1951687, at *4, "this hardship [is] outweighed by the significant difficulties that would be

MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING
ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT 15

experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time."

IV. **The Public Will Benefit.**

Preliminary relief will benefit the public because it will help people's confidence in Ohio's democratic systems. The last thing Ohioans need in these extraordinary times is the collapse of their established political system. Just as the casting of votes remains critical to Ohio's future, so does the ability to cast a vote for change. Forcing a forfeiture of that valuable right would only compound the crisis.

V. **No Monetary Security is Required.**

The Sixth Circuit has observed that security is not mandatory under Rule 65(c) and can be dispensed with in the discretion of the court. *See Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Security is regularly dispensed with in election cases. *See, e.g., Libertarian Party of Ohio v. Husted*, 2014 WL 11515569, *11 (S.D. Ohio 2014). No security is needed in this case as it threatens no financial harm to Defendants or Ohio.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully move the Court to **GRANT** the preliminary relief requested.