Michael R. McCarter
CascadeCarry@outlook.com
53161 Bridge Dr.
La Pine Oregon, 97739
503-339-5654
Plaintiff, appearing *Pro Se*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MICHAEL R. MCCARTER, in his official capacity as president of *Move Oregon's Border* <br><br> Plaintiff, <br><br> v. <br><br> KATE BROWN, in her official capacity as Governor of Oregon, BEV CLARNO, in her official capacity as Secretary of State of Oregon, STEFANIE KIRBY in her official capacity as Baker County Clerk, CHERYL SEELY in her official capacity as Crook County Clerk, RENEE' KOLEN in her official capacity as Curry County Clerk, DANIEL LOOMIS in his official capacity as Douglas County Clerk, BRENDA PERCY in her official capacity as Grant County Clerk, DERRIN ROBINSON in his official capacity as Harney County Clerk, CHRIS WALKER in her official capacity as Jackson County Clerk, KATHERINE ZEMKE in her official capacity as Jefferson County Clerk, RHIANNON HENKELS in her official capacity as Josephine County Clerk, ROCHELLE LONG in her official capacity as Klamath County Clerk, STACIE GEANEY | Case No.: 6:20-cv-01048-MC <br><br> SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT |

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT                 1

in her official capacity as Lake County Clerk, GAYLE TROTTER in her official capacity as Malheur County Clerk, BOBBI CHILDERS in her official capacity as Morrow County Clerk, JENINE MCDERMID in her official capacity as Sherman County Clerk, KIM LINDELL in her official capacity as Chief Elections Officer of Umatilla County, ROBIN A. CHURCH in her official capacity as Union County Clerk, and SANDY LATHROP in her official capacity as Wallowa County Clerk,

                        Defendants.

---

1. Plaintiff here files a motion that differs from the first in that it requests a different remedy, references compelling evidence of diligence, and makes other improvements such as better addressing issues of ripeness and laches.

2. As the required number of signatures have already been gathered in Wallowa County, and as Plaintiff is not a chief petitioner of an active petition in Crook County or Malheur County, the remedy requested below does not address Defendants who are officers of those counties. Plaintiff is a chief petitioner of an initiative in each of the other counties listed below, including Sherman County.

3. Plaintiff requests that the Court direct Defendants (excluding the Wallowa County Clerk, the Crook County Clerk, and the Malheur County Clerk) to verify, qualify, and certify as a county measure for the November 3, 2020 ballot any petitions that have been filed by Michael McCarter that have been approved for circulation by the chief elections official of their county prior to or on August 24, 2020, and have 20% of the normally required number of valid signatures submitted prior to or on August 24, 2020.

4. Plaintiff certifies that he emailed this Motion, Plaintiff's Declaration, and Plaintiff's Second Proposed Order on July 22, 2020 to each Defendant or counsel of Defendant, using email addresses listed on government websites or in government emails.

### MEMORANDUM OF LAW IN SUPPORT

The COVID-19 pandemic has given rise to an extraordinary set of circumstances in Oregon and nationwide. In an effort to contain the virus and protect the public health, the State of Oregon has implemented several emergency measures that, although perhaps reasonable in light of the public health crisis, make it impossible for Plaintiff and other citizens to comply with the statutory procedures they must follow to participate in Oregon's electoral processes. In particular, as chief petitioner, Plaintiff is required by law to obtain voters' signatures on petitions to qualify his ballot initiatives on Oregon's November 3, 2020 general election ballot. Under the emergency measures now in place, however, Plaintiff cannot lawfully comply with these requirements. These emergency measures are listed in Plaintiff's Complaint, paragraphs 35-38 and 40-41.

The deadline for submitting county ballot initiative signatures for this election cycle is August 5, 2020. Plaintiff has received from Defendants no offers of relief or accommodation. Plaintiff therefore urgently needs the relief requested herein, to protect his speech and petitioning rights as guaranteed by the First and Fourteenth Amendments. In the absence of such relief, Plaintiff will suffer irreparable harm, because his petitions and his organization's petitions will be excluded from the 2020 election ballot.

### Argument

We here incorporate the text of the argument given in pages 11 through 20 in the Plaintiff's Motion for Temporary Restraining Order And/Or Preliminary Injunction in an ongoing case in the US District Court for the Southern District of Ohio, number 2:20-cv-02129. We request that the

argument be understood to refer to Oregon rather than Ohio. As *Pro Se* Plaintiff, I humbly request that that argument be read in full at the link given in this footnote.[1]

## Diligence

Plaintiff excludes the first full paragraph of page 16 of that argument. In its place we will now consider the Plaintiff's diligence and the purpose of Oregon counties' signature threshold. Attached to this Motion is a sworn declaration by Plaintiff showing that by all measures, Plaintiff was diligent enough for Wallowa County. In Wallowa County, the movement gathered enough signatures to meet the original signature threshold days or weeks before August 5. Plaintiff applied the same diligence in the other counties he has petitions in. This diligence paid off in Jefferson County also, but the lockdown has thwarted the results he sought in other counties.

Still, as detailed in Plaintiff's Declaration, Plaintiff managed to lead his movement to the point that it has now in hand a quantity of signatures that is a greater percentage of the signature threshold in six counties than People Not Politicians did statewide. Those counties are Wallowa, Jefferson, Union, Douglas, Grant, Harney. And when the August 5 date arrives, Plaintiff expects that Malheur County and Baker County will be added to that list. (Plaintiff is not listed as a chief petitioner on the Malheur County petition though). It would be justifiable to issue an injunction that treats different counties differently because each county has its own initiative and its own circumstances.

Plaintiff led *Move Oregon's Border* to create a website, greateridaho.org, where each petition can be downloaded. Each petition pdf file created by *Move Oregon's Border* contains instructions for collecting signatures legally and printing it double-sided, as required by law, which is a burden in itself. Plaintiff led *Move Oregon's Border* to find essential businesses where citizens

---

[1] https://clearinghouse.net/chDocs/public/VR-OH-0085-0002.pdf

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT           4

on essential business could pick up his petitions, and these are the number of locations on the current list for each county at www.facebook.com/groups/GreaterIdaho/permalink/568593160471945

| County | Count | ID |
|---|---|---|
| Douglas County: | 8 | P-10-2020-02 |
| Umatilla County: | 1 | 30-2020-IP2 |
| Josephine County: | 1 | 2020-01 |
| Grant County: | 0 | #12-77 |
| Curry County: | 2 | 20-01 |
| Harney County: | 2 | 20-05 |
| Sherman County: | 1 | PP 2020-04 |
| Wallowa County: | 6 | 32-003 |
| Baker County: | 1 | 1-104 |
| Union County: | 7 | 31-IP-2020-1 |
| Morrow County: | 0 | I-2020-5 |
| Jackson County: | 2 | Jack 20-07 |
| Klamath County: | 7 | K-20-5 |
| Jefferson County: | 5 | 20-05-IN |
| Malheur County: | 1 | 2020-23-03 |

Lake County:  0.  P-2020-1 (This is a correction to the identification number we reported in the first motion. Signature collection is not yet approved pending state circuit court case 20CV16716)

Crook County:        0

(Signature collection is not yet approved pending state circuit court case 20CV16615)

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT          5

The Declaration of Summer S. Davis, paragraph 6, says two statewide initiatives met the original statewide signature threshold for the General Election. But those campaigns began long before the pandemic, and two is a historically small number, and 72 petitions campaigns attempted to meet that goal. https://www.bendbulletin.com/localstate/state/pandemic-leads-to-unusually-short-list-of-ballot-measures/article_ae820da8-bd6f-11ea-87a2-5f833065356c.html

In *Fair Maps Nevada*, the federal court found reasonable diligence despite the facts that petitioners (1) did not file their initiative until January 7, 2020; (2) had collected less than 11% of required signatures—only about 10,000 out of the 97,598 needed; (3) did not even attempt to collect any signatures after the governor's "Stay-at-Home" order went into effect; and (4) had not presented any evidence about comparable initiative campaigns. *Fair Maps Nevada*, 2020 U.S. Dist. LEXIS 94696 at *31. Since this fact pattern showed reasonable diligence, Plaintiffs in this case satisfy this requirement in some counties. *See also SawariMedia*, 2020 U.S. Dist. LEXIS 102237, at *36 (holding Plaintiffs showed "diligence" by collecting over 60% of required initiative signatures despite waiting to file until January 16, 2020).

According to *Reclaim Idaho* 2020 WL 3490216, at *8, based on the *Angle v. Miller,* 373 F.3d 1122 (9th Cir 2012), proponents of an initiative should be "reasonably diligent" as compared to other initiative proponents. But which proponents should they be compared to? Logically, if the Oregon Constitution sets 6% as the threshold to distinguish worthy initiatives from unworthy initiatives, then the proponents should not be compared to average initiative proponents. To discover the minimum standard, they should be compared to the least diligent proponents who manage to meet the 6% signature threshold under normal times, because that 6% is the threshold established for the state. It makes no sense to compare them to initiative proponents who could gather a far larger or smaller number of signatures.

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT          6

**A better standard than diligence**

Presumably, there are volunteers who chose to download Plaintiff's petitions and start gathering signatures who are as yet unknown to Plaintiff. Rather than list the number of hours worked by volunteers for our movement in each county, which is a number Plaintiff can not certify, Plaintiff suggests that the number of signatures gathered by the deadline be the test of the movement's diligence. Plaintiff hesitates to make a log of mundane trivial activities personally accomplished on behalf of the petition campaigns, such as appearing in interviews, making Facebook posts, recruiting leaders, etc. Compared to a list of Plaintiff's activities, the signatures gathered themselves are more persuasive, more quantifiable, more verifiable, and more relevant.

The signature threshold was added to the Oregon Constitution, presumably, in the belief that if the number of petitions must be limited, then it is better to certify to the ballot those initiatives that have the support of more people. Exercising our rights should not be dependent on getting financial backing from corporations. No one in Plaintiff's movement is paid for work related to *Move Oregon's Border*. This movement does not have a corporate sponsor to pay for large mailings. A corporate sponsor should not be required for the exercise of constitutional rights.

During a pandemic, how can we determine how many people support an initiative? A movement with paid signature collectors that could just barely collect 100% of the requirement in a normal year would certainly gather far, far fewer during a pandemic. It is even worse for a movement dependent on unpaid collectors, because few potential unpaid collectors will even try if they think the threshold is unattainable. We assert that during these months of the pandemic, a petition that manages to garner 20% of the signatures required would probably have garnered 100% of the required signatures during normal times. Potential volunteers and signers are reluctant to leave their homes for non-essential purposes.

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT          7

Plaintiff should not need to show that he is more diligent than other chief petitioners, but rather that the petition is attractive enough to the populace that is would have gained 100% of the required signatures under normal conditions. Or rather, let each county prove whether the petition is attractive enough to them to provoke a movement that gathers 20% of the signatures required. Let's use the signature threshold for Jackson County, 6114, as an example. If the Court estimates that it is five times harder to motivate potential volunteers to try to successfully gather 6114 signatures during a pandemic as compared to during the normal times that the Oregon Constitution countenances, we invite the Court to reduce the signature threshold to a fifth of the normal requirements. In this way, the Oregon Constitution's ability to distinguish between attractive and unattractive petitions is preserved, and it is tuned to the correct level, as estimated by the Court. An injunction should be written such that, during the pandemic, an initiative will make the ballot if it is attractive to the populace to the degree that it would have been certified to the ballot during normal times.

### Irreparable Harm, Balance of Equities, and Ripeness

The ordinances Plaintiff is trying to get on the books, if approved by a vote in November, will enlist county governments in working toward moving state borders. Plaintiff's movement needs the support of county governments, through these ordinances, to help these counties escape Oregon governance. The risk to Plaintiff's movement is that he will fail to get a large enough group of counties on the ballot this November to make a difference in Oregon politics.

The Douglas County initiative modifies a 1997 ordinance that allows the county board to appropriate county funds to advocate for legislation to Oregon officials, by adding Idaho officials to the set of officials that may be lobbied using county funds. In two other counties, Plaintiff's

initiatives designate the county board as the board responsible for advocating the interests of the county in border relocation negotiations.

Plaintiff's initiatives for two counties create a new county board for considering state border relocation. In Josephine County, Plaintiff's initiative forbids county employees from delaying requests for information from Oregon or Idaho. In all the other counties, Plaintiff's initiatives require meetings of the county board on relocating state borders.

These meetings are not insignificant, because, as described in Plaintiff's Declaration paragraph 3, attached, state legislators in both states have already decided to begin inter-state talks on relocating the Idaho/Oregon state border.

A dramatic change such as moving a state border is hard to justify without an election that has a large turnout, but such elections only happen every 4 years, when there is a presidential election.  If Plaintiff's movement is delayed, the harm is that the relevant counties will continue to suffer the neglect of Oregon governance for two to four years longer than otherwise would be the case.

Plaintiff acknowledges that he has approval to continue gathering signatures for one to two years.  But many other initiative campaigns around the country have received injunctions despite such a situation, including People Not Politicians.

The ability of courageous volunteers to gather enough signatures in Wallowa County and Jefferson County shows that, absent the fear of the pandemic, these initiatives would have attracted enough support to get enough signatures for the 2020 General Election in every county, unlike initiatives that are so unappealing that they require two years to be qualified for the ballot.  Thus, the harm of not appearing on the General Election of 2020 ballot is what makes this case ripe.

**Balance of Equities proper**

State Defendant's Response To Plaintiff's Motion says that "Allowing a flood of initiatives would dilute the electorate's attention and decrease the quality of decision-making..." (page 14). The purpose of the signature requirement is to prevent an over-abundance of initiatives on the ballot. An over-abundance won't occur in this case because of the tight schedule remaining. It is so tight that it will not present an opportunity to new entrants. In our experience (described in Complaint paragraph 31), it takes one to six months to get permission to circulate. Even after a prospective petition has been drafted that will meet the standards of a specific county clerk, the typical county government will take four weeks to issue an approval to circulate the petition. The reason it takes four weeks is explained in Complaint paragraph 52.

If the Court chooses to allow Plaintiff's initiatives to be certified to the ballot with only 20% of the signature threshold, the 20% signature threshold could fairly be applied to other court cases in which a county initiative that was approved to circulate after January 2020. Or this requested injunction could be written to include all such initiatives. This date "January 2020" distinguishes campaigns that were limited by the pandemic from the campaigns that could have gathered enough signatures before the pandemic. A consistent, bright-line 20% rule would reduce the burden on the court system and maintain political neutrality.

Both Harney County's response and Grant County's response to Plaintiff's Motion says "If this Court grants Plaintiff's motion, Defendant urges this Court to lower the signature threshold by 50 percent and allow Plaintiff's an extension of five weeks to meet the signature threshhold" (page 8). This proves that some county clerks believe that they can accommodate an extension of five weeks.

Regarding the injunction granted to People Not Politicians, a July 15 press report quoted Oregon Attorney General Ellen Rosenblum as saying "While Secretary Clarno did not ask us to

SECOND MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY
RESTRAINING ORDER AND ATTACHED MEMORANDUM OF LAW IN SUPPORT       10

appeal Judge McShane's ruling, the Secretary deferred to our view that the overall interests of the state require us to file this appeal." https://www.oregonlive.com/news/2020/07/oregon-secretary-of-state-attorney-general-clash-on-lowering-bar-to-ballot-measure.html    Just a day after this Court's order in that case, the Oregon Secretary of State issued a press release stating she would comply with the order and was "not requesting an appeal to the ruling at this time." https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36951 Clearly, the Secretary of State finds small delays in the submission of initiative signatures manageable, as pointed out in the insightful Plaintiffs-Appellees' Opposition to Motion For Emergency Stay in this case no. 20-35630 http://ballot-access.org/wp-content/uploads/2020/07/Document171.pdf

**Laches**

Plaintiff's Declaration, paragraph 4, attached, explains why Plaintiff filed as late as June 30, 2020. There was no attempt to prejudice.  As Plaintiff's initiatives that have been approved so far were approved as late as June 12, it would have been difficult to file this as-applied constitutional challenge earlier and still meet Plaintiff's burden of proof.  It took time to get signature sheets approved by Defendants after that date, mobilize volunteers, and get signatures to prove diligence. Plaintiff had expected to be able to sue on behalf of the Malheur County petition, which was approved July 1, but Plaintiff is not listed as a chief petitioner of that petition.

**Conclusion**

Early this month, the Ninth Circuit Court of Appeals rejected an emergency stay motion in *Reclaim Idaho v Little*, No. 20-35584,  which sought to stop a more proactive change to initiative requirements than the remedies sought by Plaintiff here.  The U.S. District Court for the District of Idaho, on page 22 of the Memorandum Decision and Order for that case, summarized a conclusion of *Buckley v. Am Constitutional Law Found., Inc.*, 525 U.S. 182, 191-92 (1999) this

way: "states have 'considerable leeway' in regulating the electoral process, provided their choices do not produce 'undue hindrances to political conversations and the exchange of ideas.'"

For the foregoing reasons, Plaintiff respectfully moves the Court to **GRANT** the preliminary relief granted.

Dated: July 22, 2020.

s/Michael McCarter
Michael McCarter